975 A.2d 955 (2009)
408 N.J. Super. 564
STATE of New Jersey, Plaintiff-Respondent,
v.
Toy-Ling WASHINGTON, a/k/a Toyling L. Washington, a/k/a Toycinn Washington, Defendant-Appellant.
DOCKET NO. A-2533-07T4.
Superior Court of New Jersey, Appellate Division.
Submitted June 2, 2009.
Decided August 3, 2009.
*957 Yvonne Smith Segars, Public Defender, attorney for appellant (Peter B. Meadow, Designated Counsel, of counsel and on the briefs).
Theodore J. Romankow, Union County Prosecutor, attorney for respondent (Sara B. Liebman, Assistant Prosecutor, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges PARKER, YANNOTTI and LeWINN.
The opinion of the court was delivered by
*958 YANNOTTI, J.A.D.
Defendant Toy-Ling Washington was charged with second degree theft by unlawful taking of the property of Beverly W. Knight (Knight) in an amount of more than $75,000. Defendant was tried before a jury and found guilty. She was sentenced to seven years of incarceration and ordered to pay restitution in the amount of $118,000. Defendant appeals from the judgment of conviction entered on November 16, 2007. For the reasons that follow, we affirm defendant's conviction and the sentence imposed but vacate the order of restitution and remand the matter to the trial court for a hearing on the amount of restitution and defendant's ability to pay it.

I.
We briefly summarize the relevant facts. Knight met defendant on December 14, 2004. Knight was eighty-four years old at the time. Defendant testified that Knight's landlord had called her and told her that Knight needed to find a new residence. Defendant took Knight home for the evening. Knight continued to reside with defendant and her family until November 3, 2005, when defendant was arrested and charged with the theft of Knight's monies.
The State presented evidence that, during the time Knight resided in defendant's home, defendant had unlawfully taken $166,381 of Knight's funds, including monies in an account at PNC Bank ("PNC"). The account was opened on September 28, 2004, with a deposit of $8,449.29. As of the end of 2004, the balance in the account was $15,956.38. Beginning in January 2005, numerous withdrawals were made from the account, consisting of cash withdrawals made with an ATM card, the electronic transfer of funds and purchases made with a debit card.
Knight's PNC bank statements indicated that the debit card payments were made to "Premium Skin Care," "Piercing Pagoda," "Taste of Portugal," "CVS drugstore," "Continental Airlines," "Peking Restaurant" in North Carolina, "Mayflower Seafood" in North Carolina, "Rockaway Bedding," "Radio Shack," "Iberia Peninsula Restaurant," "Brasilia Grill," and "Forces of Nature." All of the money in Knight's PNC account was eventually withdrawn and, in September 2005, the account was closed.
Evidence also was presented which established that defendant had taken monies from Knight's account at Wachovia Bank ("Wachovia"). The account was opened on January 10, 2005, with $8,339.64. The records pertaining to the account revealed that, in the period from January 10, 2005 through November 2, 2005, various deposits were made into the account, including deposits of $10,000 from Knight's account at American Express and deposits of $15,000 and $20,000 from Knight's Ameriprise Financial accounts.
The records pertaining to the account also indicated that checks made payable to defendant were drawn on the account in the amounts of $1,400; $5,000; $5,000; $2,000; $28,000; $5,000; and $800. Checks in the amount of $10,000 and $1,300 were made payable to cash and endorsed by defendant. A "counter withdrawal" of $15,000 was made and the funds were deposited in defendant's account in the Ironbound Bank ("Ironbound").
In addition, withdrawals from Knight's Wachovia account totaling approximately $21,000 were made using the ATM machine. Funds were also drawn from the account for debit card purchases at "Peoplefinders.com," "Resorts International Hotel, Atlantic City," "Walgreens," "Sears *959 Roebuck," "Macy's," "Shop Rite," "Brasilia Restaurant," and "Empire Home Service."
The State additionally presented evidence concerning an account that defendant maintained at Wachovia. Wachovia's records indicated that, in the period from December 2004 through April 15, 2005, defendant made deposits to the account totaling $38,479. These deposits included checks that were drawn upon Knight's account. Defendant eventually withdrew all of the monies from this account and it was closed on May 25, 2005.
In addition, the State presented evidence regarding defendant's account at the Hudson City Savings Bank ("HCSB"). As of December 10, 2004, the balance in the account was $499.55. From December 2004 to November 2005, deposits totaling $83,012.87 were made to the account. The deposits to the defendant's HCSB account included checks made payable to Knight and endorsed by Knight, including a check in the amount of $18,393.21 from Met Life.
The deposits to the HCSB account also included checks drawn on Knight's accounts that were made payable to defendant. Withdrawals from the account were made for purchases at "Expertlink," "Devon Self Storage," "Sin City," "Q-Plus Beauty Supplies," "Brazilia Grill" and "Iberia Peninsula Restaurant."
Furthermore, the State presented evidence regarding defendant's account at Ironbound. The account was opened on May 25, 2005, with the deposit of a $17,001.36 bank check from Wachovia. Deposits to this account included a check from Prudential Financial in the amount of $15,865.26 payable to Knight and the aforementioned $15,000 withdrawn from Knight's Wachovia account. Beginning on June 5, 2005, defendant withdrew cash from the account in various amounts, leaving a balance of $357.74 as of November 7, 2005.
Knight testified at trial. She was living in a nursing home at the time. Knight stated that she had never seen defendant before she met her on December 14, 2004. Knight said that, when she moved in with defendant, she only brought her pills. Knight said that defendant would purchase items that she needed, such as food, medicine and supplies.
Knight also testified that defendant had hired Talitha Bomar ("Bomar") to assist her but she did not know how much defendant paid Bomar for her services. Knight also did not know the amount of rent that she paid defendant. Knight was shown copies of certain checks and she said that she was not certain if she had signed them. Knight additionally stated that she did not know the amount of monies she had in her accounts.
Knight was shown a check dated August 30, 2005 in the amount of $10,000, with a notation that the check was for taxies and doctors. Knight said that she did not recall paying $10,000 for taxies. She was questioned about a check in the amount of $1,300 for buses for "L.A." Knight replied that she could not "imagine where `L.A.' is." She stated that the handwriting on the check was not hers.
Knight was also questioned about a check dated April 6, 2005, from Met Life in the amount of $18,393.21. She said she did not recall whether she had given the money to defendant. Knight was asked whether she had purchased a computer for anyone at Radio Shack. She said that she did not remember buying a computer.
Knight further testified that she did not authorize anyone to use her money for "Expert Link" or for the purchase of $400 worth of perfume at the Livingston Mall. She said that she never went to "Brazilia Grill," "Q Beauty Supplies," "Sin City" or "Piercing Pagoda." She stated that she *960 never gave anyone permission to use her ATM card at a hotel in Atlantic City, and never took a flight on Continental Airlines while she was living with defendant.
Defendant testified on her own behalf. She denied that she stole any money from Knight. Defendant stated that she and Knight agreed that Knight would pay her $700 per month for services and expenses. Defendant said that Knight came to her home with only a nightgown. She had to purchase bedroom furniture and clothes for Knight and get Knight's medical care "lined up." Defendant stated that Knight was "family, and it took money to take care of this elderly individual that was my family, and it wasn't a service."
Defendant further testified that Knight kept her ATM card in her possession and knew every occasion when it was used. Defendant maintained that the card had been used for Knight's care. Defendant stated that she purchased food for Knight at "Brazilia." She asserted that she purchased perfumes for Knight because Knight "had a smell." Defendant said that she bought Knight lotions and creams "all the time."
Defendant also said that she had to make modifications to the bathroom for Knight, for which she paid $800. She asserted that it cost $2,500 to fix the toilet because Knight had caused it to back up. Defendant had a deck installed at her home at a cost of $9,000 so that Knight could go outside. Defendant also purchased flowers for Knight and said that Knight had agreed to pay for them. In addition, defendant had an exterminator come in to deal with a roach problem that arose because Knight kept food in her room.
Defendant additionally testified that she paid Bomar to do Knight's hair. She denied that she "duped" Knight into surrendering her Met Life annuity to her. She stated that some of the money in her accounts was from a "settlement for [her] teeth." She also stated that Knight agreed to purchase her son a laptop computer and Knight went with her to Radio Shack to buy it.
Defendant stated that she traveled to North Carolina to attend the funeral of her ex-husband's father. She said that Knight offered her the ATM card and told defendant to "[t]ake what you need and go." Defendant also explained that the $1,300 check was for "buses for LA[.]" She said that she had raised money for buses to travel to Louisiana after Hurricane Katrina. According to defendant, the check was Knight's contribution to that cause. Defendant stated that she paid Knight's taxes and the mortgage payments for property Knight owned in South Carolina. She also said that she purchased Knight's medications.
On cross-examination, defendant denied that she had stolen Knight's money. She acknowledged that she had deposited Knight's money into her account. She said that she did so because there was "a lot of identity theft going on" and it was easier for her. She was asked about the amount spent to purchase perfumes for Knight and said that she did not "know how to buy cheap stuff."
Defendant also was asked how much money she spent for Knight and she said that she "never tallied it, but [she knew that] Knight's money went to take care of [Knight], and [it] was okay with her to spend [the money] in any other places like Katrina or something like that." Defendant stated that she did not "have any use for ... Knight's money."
The jury found defendant guilty of theft by unlawfully taking or exercising unlawful control of Knight's movable property with a value of at least $500 but less than *961 $75,000. The jury also found that defendant was guilty of theft by deception of property with a value of at least $500 but less than $75,000. The jury found defendant not guilty of theft by failure to make a required disposition. The jury further determined that the thefts were part of a common scheme or course of conduct and found that the aggregate amount of theft was $75,000 or more.

II.
Defendant appeals and raises the following issues for our consideration.
POINT ONE
THE TRIAL COURT FAILED TO ADEQUATELY INSTRUCT THE JURY REGARDING HOW TO CALCULATE THE AGGREGATE AMOUNT OF THE THEFT.
A. Introduction.
B. The Court's Instructions Regarding Aggregation of Theft Amounts Were Inadequate And Confusing.
C. The Jury Should Have Been Instructed That It Could Offset The Calculation Of Aggregate Expenditures By Deducting Expenditures Actually Made On Behalf Of Beverly Knight.
D. The Jury Should Have Been Instructed That It Could Find That Beverly Knight Consented To Some But Not All of the Alleged Expenditures.
POINT TWO
THE TRIAL COURT ERRED IN DENYING THE REQUEST TO INSTRUCT THE JURY [IT] COULD DRAW AN ADVERSE INFERENCE REGARDING THE PROSECUTOR'S FAILURE TO CALL PERRY KNIGHT AS A WITNESS IN THEIR DIRECT CASE.
POINT THREE
THE TRIAL COURT'S PRECLUSION OF RECEIPTS INDICATING DEFENDANT'S PURCHASE OF ITEMS FOR BEVERLY KNIGHT'S CARE AS INADMISSIBLE HEARSAY WAS A VIOLATION OF DEFENDANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS, FUNDAMENTAL FAIRNESS AND COMPULSORY PROCESS.
POINT FOUR
THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO CHARGE THE LESSER INCLUDED OFFENSE OF CREDIT CARD THEFT UNDER [N.J.S.A. 2C:21-6c(1) ] (not raised below).
POINT FIVE
THE TRIAL COURT'S SUMMARY FINDINGS WITH REGARD TO DETERMINING THE AMOUNT OF RESTITUTION AND DEFENDANT'S ABILITY TO PAY RESTITUTION VIOLATED DUE PROCESS (not raised below).
POINT SIX
DEFENDANT'S SENTENCE WAS MANIFESTLY EXCESSIVE, UNDULY PUNITIVE AND THE COURT IMPROPERLY BALANCED AGGRAVATING AND MITIGATING FACTORS AS REQUIRED BY LAW.
In addition, defendant has filed a pro se supplemental brief in which she raises the following arguments:
POINT ONE
BECAUSE THE COURT DEPRIVED THE DEFENDANT OF DUE PROCESS. A [FORENSIC] ACCOUNTING WAS NOT DONE AND JURISDICTION WAS IMPROPER.
POINT TWO
COURT ERRED WHEN IT DENIED THE [DEFENSE'S] REQUEST FOR [EXPANSION] OF THE RECORD.
POINT THREE

*962 THE COURT ERRED WHEN IT ADDED AN [OFFENSE] AND ELEMENTS.
POINT FOUR
INEFFECTIVE ASSISTANCE OF COUNSEL. DEFENDANT DID NOT KNOW SHE WAS PRO SE.
POINT FIVE
THE EVIDENCE PRECLUDED [INCLUDED] NOT ONLY [RECEIPTS], BUT POLICE REPORTS AND FORENSIC EVIDENCE.
POINT SIX
THE COURT NEVER ALLOWED CONTENTS OF THE DURABLE POWER OF ATTORNEY CONTRACT TO BE KNOWN TO JURY[.] ITS CONTENTS ARE IN DIRECT CONFLICT WITH THEFT ELEMENTS.
POINT SEVEN
THE [VIOLATIONS] OF DUE PROCESS TO SECURE A CONVICTION.
POINT EIGHT
THE PROSECUTION OF THE DEFENDANT WAS PRECIPITATED BY POLITICAL REPRISAL TO EFFECTIVELY CHILL [FEDERALLY] PROTECTED RIGHT[S] TO THE ELECTORAL PROCESS AND REDRESS WITHIN THE COURTS.

III.
We first consider defendant's contention that the court erred in its instructions to the jury on theft.
Here, defendant was charged with the theft of Knight's property. N.J.S.A. 2C:20-3a provides that, "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof." The term "deprived" is defined in N.J.S.A. 2C:20-1a to mean:
(1) to withhold or cause to be withheld property of another permanently or for so extended a period as to appropriate a substantial portion of its economic value, or with purpose to restore only upon payment of reward or other compensation; or (2) to dispose or cause disposal of the property so as to make it unlikely that the owner will recover it.
In addition, N.J.S.A. 2C:20-4 provides that, "[a] person is guilty of theft if he purposely obtains property of another by deception." Furthermore, N.J.S.A. 2C:20-9 provides in pertinent part that:
[a] person who purposely obtains or retains property upon agreement or subject to a known legal obligation to make specified payment or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he deals with the property obtained as his own and fails to make the required payment or disposition.
Theft is a second degree crime if the amount involved is $75,000 or higher. N.J.S.A. 2C:20-2b(1)(a). It is a third degree crime if the amount involved is more than $500 but less than $75,000. N.J.S.A. 2C:20-2b(2)(a). "Amounts involved in thefts ... committed pursuant to one scheme or course of conduct ... may be aggregated in determining the grade of the offense." N.J.S.A. 2C:20-2b(4).
Defendant argues that the court's instructions regarding the aggregation of the amounts of the thefts were inadequate and confusing; the jury should have been told that it could offset the aggregate amount of the thefts by deducting expenditures made on Knight's behalf; and the jury should have been instructed that it could find that Knight had consented to some but not all of the alleged expenditures. In our judgment, these contentions are entirely without merit.
*963 In this matter, the court instructed the jury as to the elements of each type of theft and said that, if the jury found defendant guilty, it would have to determine the amount of each type of theft. The court noted that, if the jury found defendant guilty of different types of theft, it would have to determine whether the amounts involved were taken as part of a "common scheme or course of conduct."
The court specifically cautioned the jury against double-counting. The court stated that, even if a particular theft was "both a theft by deception and a theft by unlawful taking," it could only be included once in the aggregate amount. The court further explained that the verdict sheet would ask the jury to determine "without duplicating amounts, what ... that combined amount of theft was[.]"
It is clear, therefore, that the instructions properly informed the jury as to the manner in which it could aggregate the amounts found as to the various types of theft. The court also admonished the jury that it was not to engage in double-counting when determining the aggregate amount of the alleged thefts. The court repeated that admonition when it reviewed the verdict sheet. In our view, the instructions were clear and concise and not confusing in any way.
Moreover, the court properly instructed the jury regarding Knight's alleged consent to the use of her monies. The court told the jury that Knight's consent would negate the State's case. The court explained that:
if Miss Knight made a gift of any of her monies to the defendant, then the defendant's use of those funds as her own would not be unlawful, if consent was freely and voluntarily given, ... or if she authorized the defendant to spend monies in a certain way, then the defendant's actions complying with that authorization would not be unlawful, again, if the consent was freely and voluntarily given.
The court thus clearly instructed the jury that it had the discretion to find that Knight had consented to any particular use of her funds.

IV.
Defendant additionally argues that the court erred by denying her request for a charge pursuant to State v. Clawans, 38 N.J. 162, 183 A.2d 77 (1962), because the State had not called Knight's son, Perry, as a witness. Defendant says that the court should have charged the jury that it could draw an inference that Perry's testimony would not have been favorable to the State.
In Clawans, the Court stated:
For an inference to be drawn from the nonproduction of a witness it must appear that the person was within the power of the party to produce and that his testimony would have been superior to that already utilized in respect [of] the fact to be proved.
For obvious reasons the inference is not proper if the witness is for some reason unavailable or is either a person who by his position would be likely to be so prejudiced against the party that the latter could not be expected to obtain the unbiased truth from him, or a person whose testimony would be cumulative, unimportant or inferior to what had been already utilized.
[Id. at 171, 183 A.2d 77 (citations omitted).]
Here, the trial court denied defendant's request for the Clawans charge in part because "this witness is not uniquely in a position to be called by the State." Although defendant's attorney said that the State had "better access" to Perry, defendant *964 presented no evidence establishing that she could not find Perry or secure his testimony.
Moreover, although defendant claimed that, prior to December 14, 2004, Perry had control of Knight's finances and had taken about $100,000 from her accounts, it appears that Knight only gave her son $25,000 after she began to reside with defendant. Therefore, Perry's testimony would have had little bearing upon the State's obligation to prove that defendant had unlawfully taken $166,381 of Knight's monies in the period from December 14, 2004 to November 3, 2005. Thus, there was no basis for an inference that, had he been called, Perry's testimony would have been adverse to the State.

V.
Defendant also argues that the court erred by failing to instruct the jury on credit card theft, which defendant contends is a lesser included offense of theft. At trial, defense counsel did not seek this instruction. The court therefore had no obligation to charge the jury on credit card theft unless "the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense." State v. Jenkins, 178 N.J. 347, 361, 840 A.2d 242 (2004).
Credit card theft does not require proof of the unauthorized use of a credit card, but rather only its unauthorized possession. N.J.S.A. 2C:21-6c(1) provides that:
[a] person who takes or obtains a credit card from the person, possession, custody or control of another without the cardholder's consent or who, with knowledge that it has been so taken, receives the credit card with intent to use it or to sell it, or to transfer it to a person other than the issuer or the cardholder is guilty of a crime of the fourth degree. Taking a credit card without consent includes obtaining it by any conduct defined and prescribed in Chapter 20 of this title, Theft and Related Offenses.
In this case, the evidence presented at trial did not "clearly indicate" that defendant would be convicted of credit card theft and acquitted of theft. The evidence did not "clearly indicate" that defendant had only engaged in the unauthorized possession of Knight's credit card, rather than the unauthorized use of the card. We are therefore convinced that the trial court did not err by failing to instruct the jury on credit card theft.

VI.
Defendant next argues that the court erred by refusing to permit her to present certain receipts for items she claimed were purchased for Knight's benefit. The trial court excluded this evidence because the receipts contained statements that were hearsay, and the receipts could not be admitted as business records pursuant to N.J.R.E. 803(c)(6) because they had not been properly authenticated. The court did, however, permit defendant to testify as to the specific purchases in question. Defendant argues that the trial court's ruling deprived her of her right to present a defense.
Again, we disagree. The receipts were inadmissible, as the court determined. Moreover, defendant testified concerning the expenditures that she allegedly made on Knight's behalf. There was no dispute as to whether the purchases were made. Rather, the State and defendant disagreed as to whether the purchases were made for Knight or with her consent. The receipts would not have shed any light on those critical facts.
We accordingly conclude that the trial court's evidentiary ruling was not a mistaken *965 exercise of its discretion. We also conclude that the exclusion of the evidence did not deprive defendant of her right to present a defense.

VII.
Defendant argues in her pro se supplemental brief that the trial court erred by "adding" theft by deception. We disagree.
Here, the indictment charged defendant with theft by unlawful taking or exercising unlawful control of Knight's property, contrary to N.J.S.A. 2C:20-3. The court charged the jury on that offense and also charged the jury on theft by deception, contrary to N.J.S.A. 2C:20-4, and theft by failure to make a required disposition of property received, contrary to N.J.S.A. 2C:20-9. In our judgment, the court did not err by charging the jury on the three offenses.
N.J.S.A. 2C:20-2a provides in pertinent part that:
A charge of theft or computer criminal activity may be supported by evidence that it was committed in any manner that would be theft or computer criminal activity under this chapter, notwithstanding the specification of a different manner in the indictment or accusation, subject only to the power of the court to ensure fair trial by granting a bill of particulars, discovery, a continuance, or other appropriate relief where the conduct of the defense would be prejudiced by lack of fair notice or by surprise.
Thus, under the Criminal Code, "theft" is a single offense and a defendant charged with "theft" may be found guilty if the defendant's conduct constitutes "theft" under any provision of Chapter 20 of the Code, notwithstanding the specification in the indictment. See State v. Talley, 94 N.J. 385, 390, 466 A.2d 78 (1983) (holding that N.J.S.A. 2C:20-2a permits conviction for theft by deception even though the indictment charged robbery).
In our judgment, based on the evidence presented, the trial court did not err by charging the three theft offenses. Furthermore, the record does not indicate that defendant was prejudiced by the court's instruction.

VIII.
We turn to defendant's argument that the trial court erred in its finding and weighing of the aggravating and mitigating factors.
At sentencing, the trial court found aggravating factors under N.J.S.A. 2C:44-1a(2) (gravity and seriousness of harm inflicted on the victim); N.J.S.A. 2C:44-1a(9) (need to deter defendant and others from violating the law); and N.J.S.A. 2C:44-1a(12) (defendant committed the offense against a person she knew or should have known was 60 years or older, or disabled). The court also found mitigating factors under N.J.S.A. 2C:44-1b(7) (defendant has no prior criminal record); N.J.S.A. 2C:44-1b(9) (defendant's character and attitude indicate that she is unlikely to commit another offense); and N.J.S.A. 2C:44-1b(11) (imprisonment will entail excessive hardship to defendant or her dependents). The court determined that the aggravating factors outweighed the mitigating factors.
Defendant argues that the court engaged in impermissible "double counting" by relying upon Knight's vulnerability in finding aggravating factor two while also finding aggravating factor twelve based on the fact that the victim was 60 years or older. We do not agree.
The court's finding factor two was not based primarily upon Knight's age but rather upon what the court called the "parasitic" nature of defendant's conduct. In our judgment, the court did not engage in *966 "double counting." The record fully supports the court's finding of aggravating factors two and twelve.
Defendant further contends the court should have found that she is a good candidate for probation, which is a mitigating factor under N.J.S.A. 2C:44-1b(10). Here, the court determined that defendant was not a good candidate for probation because of her "litigious" nature. The court also stated that it did not believe that defendant would be able to get along with or conform to the directions of a probation officer.
Although we have some doubt as to the factual basis for the court's finding, we conclude that the judge reached the right result. Defendant was convicted of a second degree offense, for which there is a presumption of incarceration. N.J.S.A. 2C:44-1d. Defendant did not establish any basis to override that presumption, particularly in view of the seriousness of the offense and the manifest harm resulting from her unlawful conduct.
Defendant also argues that the court should have found that her criminal conduct was the result of circumstances unlikely to recur, which is a mitigating factor under N.J.S.A. 2C:44-1b(8). Again, we disagree. At trial, defendant testified that she "routinely" took people into her home to care for them. She also testified that she could not account for all of her expenditures on behalf of Knight because she was disorganized. In our judgment, there is sufficient evidence in the record to support the court's determination regarding mitigating factor eight.
We are therefore satisfied that the record supports the court's findings and weighing of the aggravating and mitigating factors. We are convinced that the seven-year sentence imposed here is not manifestly excessive or unduly punitive, does not represent an abuse of the judge's sentencing discretion and does not shock the judicial conscience. State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989); State v. Roth, 95 N.J. 334, 363-65, 471 A.2d 370 (1984).

IX.
Defendant additionally argues that the trial court erred in determining the amount of restitution and her ability to pay it without conducting a hearing on these issues.
Here, the State sought restitution of $166,381, which was the sum of the withdrawals or payments to defendant from Knight's accounts, the purchases made with Knight's ATM card and the other monies taken. The State opposed any offset for the value of the services rendered to Knight. The State further maintained that defendant could afford to pay this amount because her house was worth $350,000 and she had $188,000 of equity in the home. The State also noted that defendant had commenced certain civil actions and could receive some monies in settlement of her claims.
The court found that defendant had a "strong work ethic" and work history. It took note of defendant's education, training in certain fields and her status as a homeowner. The court stated that defendant has the ability to prevail in some of her civil lawsuits. The court found that defendant will be able to pay restitution in the future, although "[w]ith the state prison sentence [she] may not be."
The court additionally found that the State had proven the theft of $166,381, but determined that denying defendant a credit for the services provided to Knight would be unfair. The court determined that defendant was entitled to a credit of "something in the area of" $48,000. The *967 court granted defendant a credit in that amount and ordered restitution of $118,000.
We are convinced that a hearing is required on the amount of restitution and defendant's ability to pay it. Although the trial court found that defendant's thefts totaled $166,381, we note that the jury's findings indicate that the aggregate amount of the thefts was less than $150,000. Additionally, the record does not provide a sufficient factual basis for the court's finding as to the value of the services that defendant provided to Knight.
The record also does not provide a sufficient factual basis for the court's finding that defendant will in the future have the ability to pay $118,000 in restitution. We note that the court's own remarks suggest some uncertainty on that point. Accordingly, we vacate the order of restitution and remand the matter to the trial court for a hearing on these issues.
We have considered all of the other arguments raised by defendant and find them to be of insufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).
Affirmed in part, reversed in part and remanded to the trial court for a hearing on the amount of restitution and defendant's ability to pay it. We do not retain jurisdiction.